**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CENTER FOR FOOD SAFETY**, *et al.*,

    **Plaintiffs,**

        **v.**                         **Civil Action No.  11-1934 (JEB)**

**KEN SALAZAR**, *et al.*,

    **Defendants.**

**MEMORANDUM OPINION**

The National Wildlife Refuge System includes more than 150 million acres of public lands and waters dedicated to habitat and wildlife conservation.  The Refuge System is managed by the United States Fish and Wildlife Service and comprises various geographic regions.  In April 2011, FWS released an Environmental Assessment evaluating the impacts of allowing genetically modified corn and soybeans to be farmed on refuge land in the Midwest Region (Region 3).  The Assessment considered the potential environmental effects of four different alternatives for farming on refuge land.  Following a period of public comment, the Agency ultimately selected a fifth alternative, which allows genetically modified corn and soybeans to be farmed on refuge land for the limited purpose of habitat restoration.

Three national nonprofit organizations – the Center for Food Safety, Beyond Pesticides, and Public Employees for Environmental Responsibility – and a research, education, and farm policy group, the Cornucopia Institute, filed this suit challenging the Agency's decision permitting these crops on refuge lands.  Plaintiffs assert two causes of action.  First, they claim that given the significant environmental consequences of the decision, Defendants violated the National Environmental Policy Act by failing to prepare a full Environmental Impact Statement.

Second, they argue that Defendants violated the National Wildlife Refuge System Administrative

Act of 1966 and the National Wildlife Refuge Improvement Act of 1997 by failing to make a

Compatibility Determination for each refuge and by finding that cultivation of genetically

modified crops is a compatible use for some refuges.  All parties have now moved for summary

judgment.  Because the Court concludes that the Agency's actions were not arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law, the Court will grant the

Defendants' Motion and deny Plaintiffs'.

**I.      Background**

      A.  National Wildlife Refuge System

      The Refuge System contains 553 national wildlife refuges and 38 wetland management

districts throughout the country.  See FWS005400.  "The mission of the System is to administer

a national network of lands and waters for the conservation, management, and where appropriate,

restoration of the fish, wildlife, and plant resources and their habitats within the United States for

the benefit of present and future generations of Americans."  See National Wildlife Refuge

System Improvement Act of 1997 § 4, 16 U.S.C. § 668dd(a)(2).  "Each refuge shall be managed

to fulfill the mission of the System, as well as the specific purposes for which that refuge was

established." § 668dd(a)(3)(A).  The Midwest Region (Region 3) includes 54 national wildlife

refuges and 12 wetland management districts in Illinois, Iowa, Indiana, Michigan, Minnesota,

Missouri, Ohio, and Wisconsin.  See FWS005400.

      Farming has historically been an "important tool used to manage refuge lands."  See

FWS000323.  It has been used for a number of purposes, including habitat restoration, habitat

management, provision of supplemental food for wildlife, and attracting wildlife for viewing and

photography.  See FWS005405.  Farming's role in habitat restoration is "to maximize the

destruction of seeds and unwanted plant parts from invasive or unwanted plant species and to

create less competition and purer stands of native species." Id.  It is used for habitat

management purposes to "remove invasive or even native plants and woody vegetation from

wetlands," and it provides an additional food source for wildlife, given the decreasing

availability of native foods over the past century.  Id.  Finally, to a lesser extent than the other

three uses, row crops have "been a useful tool for attracting wildlife to areas where people can

view and photograph them."  FWS005406.  Farming on refuge land is typically done pursuant to

cooperative farming arrangements, whereby local farmers plant on designated areas in a refuge

and harvest a share of the crop.  See FWS000323, FWS005404.  Refuge and District Managers

set forth the terms and conditions of the farming that will be permitted on the land, including

how long farming will be allowed on a specific tract and which crops will be grown and how the

crops will be rotated.  See FWS005416.  Managers are also responsible for enforcing the terms

set forth in these cooperative agreements, as well as in any other agreements governing the terms

of the farming on refuge lands, such as Pesticide Use Proposals.  See FWS005491.

     B.  Factual and Procedural Background

     In 2010, FWS identified a need to develop a "consistent regional position for farming" in

Region 3.  FWS000292.  Specifically, the Service believed it should prepare National

Environmental Policy Act documents in light of "concern[s] about the potential for impacts on

refuges and on neighboring lands" from the advance of genetically modified crops.  See

FWS000294.  The Service further noted that "several eastern refuges have [recently] been sued

over the use of genetically modified crops and the NEPA process."  Id.  Such crops include

glyphosate-tolerant corn and soybeans, which have been genetically modified through insertion

of a gene that allows the plant to tolerate applications of the herbicide glyphosate.  See

FWS000321.  These crops "allow[] for the effective control and elimination of noxious weeds and other undesirable plants prior to the area being reseeded or allowed to revegetate to more desirable species."  Id.  The use of genetically modified, herbicide-tolerant crops has increased substantially in recent years, constituting 92 percent of soybean acres and 80 percent of corn acres in 2008.  See FWS005404 (citing Brookes 2010).

To address concerns about the effect of genetically modified (GM) – also called genetically engineered (GE) – crops on the environment, the Agency decided that it would develop a programmatic Environmental Assessment (EA) for Region 3.  See FWS000292; see also FWS000299 ("R3 to complete programmatic EA.").  The Agency formulated a process to develop the EA, which included public scoping of issues, completion of a draft EA, a public-comment period, and ultimately, finalization of the EA.  See FWS000302, FWS000320.  Consistent with this approach, a draft of the EA was made available for public comment on January 10, 2011, with comments due by February 14.  See FWS003400-01.

The Draft EA evaluated four alternatives "based on a review of authorities, policies, and regulations as well as review of the comments received during the initial public comment period held to determine what issues should be addressed in this EA."  See FWS000757.  The alternatives evaluated in the Draft EA were:

- Alternative A:  Continue Farming for Multiple Objectives, GMGT Corn and Soybeans Allowed (No Action) (Preferred Alternative), see FWS000760-61;

- Alternative B:  Farming for Habitat Restoration Objectives Only, GMGT Corn and Soybeans Allowed, see FWS000761-62;

- Alternative C:  Farming for Multiple Objectives, No GMGT Corn and Soybeans, see FWS000762; and

- Alternative D:  Limited Row Crop Farming, No GMGT Corn and Soybeans.

4

See FWS000762-63.  The EA "considered" but did not "develop[]" two additional alternatives:

no farming and unmanaged succession, which occurs when land is allowed to grow back with no

human land management.  See FWS000757.  The Agency did not pursue either of these

alternatives because it determined that neither would "fulfill the establishing purposes of refuges

and wetland management districts."   See id.  Specifically, the Agency stated that it lacked the

necessary resources to restore lands under the "no farming" alternative, and "unmanaged

succession" would take more time and would likely result in "vegetation dominated by

undesirable, non-native plants."  Id.

The Agency sought input from the public on the Draft EA, with outreach efforts that

included

> sending news releases to more than 790 media outlets, posting
> information at refuges and wetland management districts
> throughout the Midwest Region, providing information to local
> farming interests, and providing information to 107 congressional
> staff within the eight-state Region.  In addition, the Midwest
> Region posted information on a website[] throughout the planning
> process. . . .  More than 30 written comments and e-mails were
> received from farmers participating in the Refuge System farming
> program, neighboring landowners, agricultural organizations, non-
> governmental organizations and biochemical interest for the
> Midwest Region scoping.

FWS005406.  The comments received by the Agency fall into three general categories:  wildlife

issues, habitat issues, and socioeconomic issues.  See FWS005407; see also EA Appendix F

(Responses to Comments) at FWS005489-92.

Following completion of the public-review period,

> comments were evaluated and as a result of this process a fifth
> alternative was developed and ultimately selected.  Alternative E:
> Continue Farming for Multiple Objectives, GMGT Corn and
> Soybeans Allowed for Habitat Restoration Only is the selected
> alternative.  This alternative promotes long-term restoration of

5

> native habitats, such as, prairie, wetlands, bottomland hardwoods,
> and other critical habitats.

FWS005392 (emphasis added).  "Under the selected alternative, farming could continue to be used as a management tool to achieve multiple objectives, such as, habitat management, supplemental food for wildlife, and attracting wildlife for viewing and photography, but the use of GMGT crops would not be allowed to achieve these objectives."  Id.

The Agency released the Final EA on April 1, 2011, with a Finding of No Significant Impact (FONSI), concluding that the proposed management action "is not a major Federal action which would significantly affect the quality of the human environment, within meaning of Section 102(2)(c) of the National Environmental Policy Act of 1969."  Id.  Because the Agency determined that there would be no significant environmental impact, it was not required to complete a full Environmental Impact Statement (EIS).

The Final EA contains a chapter discussing the potential effects common to all of the proposed alternatives, including the effects on endangered and threatened species and on organic soybeans, ultimately determining that no negative impacts are anticipated as to either issue.  See FWS005427-29.  The EA further analyzes wildlife issues, habitat issues, and socioeconomic issues specific to each alternative.  See FWS005429-5462.  Potential environmental impacts identified and discussed in the EA include:

- Development of herbicide (glyphosate) resistance in weeds due to widespread use of GMGT corn and soybeans, see FWS005430, FWS005434;

- Potential risks "to aquatic species when some commercial formulations of glyphosate are applied too closely to water," including negative impacts on amphibians (citing Dinehart *et al*. 2010) and aquatic communities in general (citing Relyea 2005, Vera *et al*. 2010), see FWS005431; and

- Negative effects on organic farmers due to inadvertent gene flow from GM to organic crops.

<u>See</u> FWS005435.  For each of the identified environmental impacts, the EA discusses practices

or policies in place to minimize their risk, such as

- Following herbicide label instructions to avoid application of the herbicide "around water, near sensitive habitats, and near threatened and endangered species," FWS005431;

- Using less toxic formulations of glyphosate, <u>see</u> <u>id.</u>;

- Applying pesticides pursuant to the conditions set forth in the cooperative farming agreements and in Pesticide Use Proposals, <u>see</u> FWS005431-32;

- Employing Integrated Pest Management techniques to "minimize the likelihood of herbicide resistance by regularly changing the technique used to control weeds: rotating type of herbicide used, rotating crop planted, and using mechanical methods," <u>see</u> FWS005434; and

- Providing buffer zones of 660 feet to curb inadvertent gene flow from GM to organic crops.

<u>See</u> FWS005435-36.

The selected alternative – Alternative E, "Continue Farming for Multiple Objectives,

GMGT Corn and Soybeans Allowed for Habitat Restoration Only" – was developed to address

the concerns raised with alternatives discussed in the Draft EA.  <u>See</u> FWS00392.  Under this

alternative, the use of GM corn and soybeans on refuge lands in the region would continue only

for the purposes of habitat restoration and would be limited to five years for any individual tract.

<u>See</u> FWS005418.  Farming could continue to be used for other objectives, such as habitat

management, supplemental food for wildlife, and attracting wildlife for viewing and

photography; however, such farming could only be done with non-GM crops.  <u>See</u> <u>id.</u>  The

selected option thus allows for a more limited use of GM crops than Alternative A (the original

"Preferred Alternative"), as each tract is limited to five years of GM crops, and GM crops are

permitted for only one objective – habitat restoration – rather than for multiple objectives.  <u>See</u>

FWS005460-61, FWS005418.

On November 2, 2011, Plaintiffs filed this suit on behalf of themselves and their members alleging that Defendants' region-wide EA and FONSI violated NEPA (Count I) and that their failure to perform Compatibility Determinations and their decision that cultivating genetically engineered crops on refuges is a "compatible use" violated the National Wildlife Refuge System Administration Act and the National Wildlife Refuge Improvement Act (Count II). They named as Defendants Ken Salazar, Secretary of the United States Department of the Interior; Daniel Ashe, Director of FWS; and FWS itself. All parties have now filed Motions for Summary Judgment. The Court also permitted the American Farm Bureau Federation, Ducks Unlimited, Inc., Delta Wildlife, and the Biotechnology Industry Organization to submit joint briefing as *amici curiae*.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.

In a case involving review of a final agency action under the APA, however, the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record. See Sierra Club v. Mainella, 459 F.Supp.2d 76, 89-90 (D.D.C. 2006) (citing Nat'l Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7

8

(D.D.C. 2005); Fund for Animals v. Babbitt, 903 F.Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997)). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006). This is a "narrow" standard of review as courts defer to the agency's expertise. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation omitted). The reviewing court "is not to substitute its judgment for that of the agency." Id. Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974).

## III.    Analysis

While Plaintiffs contend that they are entitled to summary judgment, Defendants challenge both the Court's subject-matter jurisdiction here and the merits of Plaintiffs' claims.

The Court's first task is thus to ensure that it has jurisdiction to decide the case.  See, e.g., Dominguez v. UAL Corp., 666 F.3d 1359, 1362 (D.C. Cir. 2012) ("[E]very federal court has a 'special obligation to satisfy itself' of its own jurisdiction before addressing the merits of any dispute.") (quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986)). Ultimately concluding that Plaintiffs do have standing to pursue their claims, the Court will then reach the substance of Plaintiffs' allegations.  In the end, it determines that FWS acted neither arbitrarily and capriciously nor contrary to its governing statute when it allowed genetically modified corn and soybeans to be grown on refuges in the Midwest.

A.  Standing

Defendants seek to dismiss the Complaint on the ground that Plaintiffs lack standing, leaving the Court without subject-matter jurisdiction over their claims.  Article III of the Constitution limits the power of the federal judiciary to the resolution of "Cases" and "Controversies."  U.S. Const. art. III, § 2; see also Allen v. Wright, 468 U.S. 737, 750 (1984) (discussing case-or-controversy requirement).  "This limitation is no mere formality: it 'defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded.'"  Dominguez, 666 F.3d at 1361 (quoting Allen, 468 U.S. at 750). Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), finding that a plaintiff has standing is a necessary "predicate to any exercise of [the Court's] jurisdiction."  Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996).

The doctrine of standing "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'"  Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009) (citing

Warth v. Seldin, 422 U.S. 490, 498-99 (1975)).  At its "irreducible constitutional minimum," the doctrine requires a plaintiff to prove three elements: (1) a concrete and particularized injury-in-fact, (2) a causal relationship between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  See Lujan, 504 U.S. at 560–61.  Organizations suing on their own behalf, like individuals, must satisfy these three requirements.  See Nat'l Taxpayers Union, Inc. v. U.S., 68 F.3d 1428, 1433 (D.C. Cir. 1995) (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 378 (1982)).

Defendants contend that Plaintiffs have failed to show "any of the three bedrock requirements of Article III standing:  injury in fact, traceability, and redressability."  See Defs.' Mot. at 7-8.  Specifically, Defendants point to Plaintiffs' failure to "submit[] a single standing declaration that purports to show standing, instead of relying on mere allegations and pure speculation," and their "fail[ure] to establish that even a single one of their members has ever even visited any of the refuges, let alone has imminent plans to visit one in the future that might be affected by the conduct that Plaintiffs challenge."  See id. at 8.  Plaintiffs dispute this, arguing that they "have standing, based on their organizations' core missions and their members' refuge activities."  See Pls.' Reply at 1.  They attach to their Reply eight declarations – from members and organization leadership – in support of the claimed injury.  See id., Exh. A (Declaration of Donna Davis); Exh. B (Declaration of Will Fantle); Exh. C (Declaration of Mimi Jennings); Exh. D (Declaration of Andrew Kimbrell); Exh. E (Declaration of Jeff Ruch); Exh. F. (Declaration of Jay Feldman); Exh. G (Declaration of Blake Anderson); Exh. H (Declaration of David Wagner).

When an organization is suing on behalf of its members, it must establish "representational" or "associational" standing.  To do so, it needs to show that "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000) (citing Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)); see also American Library Ass'n v. FCC., 401 F.3d 489, 492 (D.C. Cir. 2005).   To satisfy the first prong, it is "not enough to aver that unidentified members have been injured." Chamber of Comm. v. EPA, 642 F.3d 192, 199 (D.C. Cir. 2011).  Rather, the organization must name at least one member who has suffered the requisite harm.  See Summers, 555 U.S. at 498-99.

Plaintiffs claim that this test for associational standing is satisfied here, where

> (1) Plaintiffs' members have standing, (2) preventing the proliferation of transgenic herbicide promoting crops on national wildlife members is germane to all Plaintiff organizations' purposes, (3) there is no need for Plaintiffs' members to participate in the lawsuit; and (4) Plaintiffs' injuries fall within the zone of interests of NEPA and the Refuge Act.

Pls.' Reply at 2.

A look at these four points convinces the Court that Plaintiffs are correct.  First, Plaintiffs provide a substantial discussion of the "aesthetic, recreational, and environmental interests" of their members and how such interests will be impaired by the Agency's policy of allowing transgenic crops on Midwest refuges, thus demonstrating injury and causation.  See id. at 2-5. For instance, they note that

> Plaintiffs' members utilize the Midwest wildlife refuges for an array of recreational activities, including wildlife viewing, studying native plants, bird watching, hiking, fishing, and participating in educational events held at the refuges.  Davis Decl. ¶ 5; Jennings Decl. ¶ 5; Wagner Decl. ¶ 6; Anderson Decl. ¶ 5. Plaintiffs' members reside near Midwest wildlife refuges, are avid visitors to them, and are passionate about the recreational opportunities these refuges have to offer.  Davis Decl. ¶ 5; Jennings Decl. ¶¶ 5-6; Wagner Decl. ¶ 5; Anderson Decl. ¶ 5.

Id. at 3.  Further, they claim that this injury is redressable, as a "decision in Plaintiffs' favor vacating the agency's approval action will remedy Plaintiffs' injuries, because the planting [of] transgenic crops on Midwest refuges would no longer be allowed."  Id. at 5.

Second, Plaintiffs demonstrate that the interests at stake are germane to the purposes of each organization.  See, e.g., id. at 5 ("[Beyond Pesticide's] mission is to protect public health and the environment by encouraging a transition away from pesticides, including herbicides used with transgenic crops."; "Center for Food Safety was established to protect the environment from harmful food production technologies . . . .   CFS and its members' interest in protecting the environment and human health from harmful agricultural practices are directly implicated in this case.") (internal citations omitted).

Third, there is no need for individual members of the Plaintiff organizations to participate in the suit since the organizations can represent those members' interests and no individual relief is sought.  Fourth and finally, Plaintiffs contend that prudential standing is satisfied here, as "recreational and aesthetic interests 'are plainly within the zone of interests protected by NEPA . . . .'"  Id. at 6 (citing Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1236 (D.C. Cir. 1996)).

In their Reply, Defendants do not challenge any of these assertions; instead, they maintain only that Plaintiffs' declarations "fail[] to establish standing for a majority of the refuges at issue in this case, because Plaintiffs fail to show that they suffer injury with respect to each individual refuge," as the declarations "only allege specific connections to eleven refuges or management districts."  See Defs.' Reply at 2.  Plaintiffs – in their response to a similar argument made by amici – counter that such a showing is not necessary and that the declarations establishing that "Plaintiffs' members utilize and visit many of the Midwest wildlife refuges that

are currently growing or can grow herbicide-resistant crops" are sufficient to establish standing. See Pls.' Response to Amicus Br. at 3.  The Court agrees.

Plaintiffs' declarations allege injury with respect to affected refuges within Region 3 and are sufficient to ensure that "'the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.'"  Wyoming Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) (quoting Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982)).  As such, it is not necessary that Plaintiffs establish standing with respect to each individual refuge.  See, e.g., Alaska Ctr. for Env't v. Browner, 20 F.3d 981, 985 (9th Cir. 1994) (rejecting argument that plaintiffs could not establish standing for state-wide environmental claim without establishing injury in fact with respect to "'every water body that would be affected by the state-wide [] program'" and finding plaintiffs satisfied standing requirements to pursue state-wide claim where plaintiffs established they were adversely affected by inadequate water quality of a "representative number of waters" throughout state).

Finding that Plaintiffs have established standing, the Court may now evaluate the merits of their claims.

B.  Count I:  NEPA Violation

    1.    *Background*

NEPA has twin aims: it "places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 97(1983), and "it ensures that the agency will

inform the public that it has indeed considered environmental concerns in its decisionmaking process." Id.

NEPA's requirements are "procedural," requiring "agencies to imbue their decisionmaking, through the use of certain procedures, with our country's commitment to environmental salubrity." Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 193-94 (D.C. Cir. 1991). Significantly, "NEPA does not mandate particular consequences," id. at 194, and courts are discouraged from substituting their own policy judgments for that of the agency. See N. Slope Borough v. Andrus, 642 F.2d 589, 599 (D.C. Cir. 1980); see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (refusing to second-guess an agency's decision – even if it finds contrary views more persuasive – so long as agency followed NEPA's procedures). "NEPA merely prohibits uninformed – rather than unwise – agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 351 (1989). Agency actions with adverse environmental effects can nonetheless be NEPA-compliant where "the agency has considered those effects and determined that competing policy values outweigh those costs." Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 191 (4th Cir. 2009) (internal citations omitted).

Under NEPA, an agency must prepare an Environmental Impact Statement for any proposed major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C) (2006). In an EIS, the agency is required to "take a 'hard look' at the environmental consequences before taking a major action." Baltimore Gas, 462 U.S. at 97 (citations omitted). An EIS must detail the environmental impact of the proposed action, any adverse effects, alternatives to the proposed action, the relationship between man's short-term

uses and the long-term effects, and any irreversible commitments of resources.  Id. at 89 n.1; see also Fund for Animals v. Hall, 777 F. Supp. 2d 92, 96 (D.D.C. 2011).

To determine whether an agency must prepare an EIS, it will first prepare an Environmental Assessment.   See 40 C.F.R. § 1501.4(b) (2012).  An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  Id. § 1508.9(a).  The EA must discuss the need for the proposal, the alternatives, and the environmental impacts of the proposed action and the alternatives.  Id. § 1508.9(b).  If, after preparing an EA, the agency determines that a full EIS is not necessary, it must prepare a Finding of No Significant Impact (FONSI) setting forth the reasons why the action will not have a significant impact on the environment.  Id. §§ 1501.4(e), 1508.13; see Flaherty v. Bryson, 850 F. Supp. 2d 38, 45 (D.D.C. 2012); In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litig., 818 F. Supp. 2d 214, 222 (D.D.C. 2011).  This is what occurred here.

            2.      *Legal Adequacy of the EA*

In reviewing an agency's decision not to issue an EIS, the Court's role is a "limited" one, "designed primarily to ensure 'that no arguably significant consequences have been ignored.'" TOMAC, Taxpayers of Michigan Against Casinos v. Norton, 433 F.3d 852, 860 (D.C. Cir. 2006) (quoting Pub. Citizen v. Nat'l Highway Traffic Safety Admin., 848 F.2d 256, 267 (D.C. Cir. 1988)); Town of Cave Creek, Ariz. v. FAA, 325 F.3d 320, 327 (D.C. Cir. 2003).  An agency's decision to issue a FONSI – and therefore not to prepare an EIS – will only be overturned "if the decision was arbitrary, capricious, or an abuse of discretion."  Sierra Club v. Peterson, 717 F.2d 1409, 1413 (D.C. Cir. 1983).

When examining the adequacy of the FONSI (and the EA upon which it was based), courts consider four factors.  Courts must determine whether the agency:

> (1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.

Sierra Club v. Van Antwerp, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (quoting TOMAC, 433 F.3d at 861) (internal quotation marks omitted).  Pursuant to this framework, Plaintiffs contend that the instant EA is "fatally flawed."  See Pls.' Mot. at 12-13.  First, Plaintiffs launch a combined challenge under the second and third factors, arguing that the EA failed to take a "hard look" at the impact of GE crops and "provid[ed] only a cursory review" of their significant impacts.  See id. at 14.  Second, they challenge the Agency on the final factor, claiming that Defendants did not show that the mitigation measures relied on in the EA would reduce the significant environmental impacts, thus obviating the need for an EIS.  Id. at 28; see also Pls.' Reply at 6-7, 9-14.  The Court will consider each in turn.

### a.   "Hard Look" & Convincing Case for FONSI

As discussed above, under NEPA, Defendants' EA must "take[] a hard look at the problem."  Van Antwerp, 661 F.3d at 1154.  "Although the contours of the 'hard look' doctrine may be imprecise," a court must at a minimum "'ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary and capricious.'"  Nevada v. Dep't of Energy, 457 F.3d 78, 93 (D.C. Cir. 2006) (quoting Baltimore Gas, 462 U.S. at 97-98).  A "hard look" includes "considering all foreseeable direct and indirect impacts. . . .  [It] should involve a discussion of adverse impacts that does not

improperly minimize negative side effects."  <u>N. Alaska Envtl. Ctr. v. Kempthorne</u>, 457 F.3d 969,

975 (9th Cir. 2006) (internal quotation marks and citation omitted).  As the Fourth Circuit

recently advised:

> In conducting this review, we "may not 'flyspeck' [the] agency's
> environmental analysis, looking for any deficiency, no matter how
> minor."  Instead, we "must take a holistic view of what the agency
> has done to assess environmental impact" and "examine all of the
> various components of [the] agency's environmental analysis . . .
> to determine, on the whole, whether the agency has conducted the
> required 'hard look.'"

<u>Webster v. U.S. Dept. of Agric.</u>,  685 F.3d 411, 421-22 (4th Cir. 2012) (internal citations

omitted).

Plaintiffs mount three distinct challenges to the adequacy of the EA's hard look and its

FONSI.  First, they claim that the Agency failed to adequately evaluate three adverse impacts

associated with allowing GE crops on refuge land.  Second, Plaintiffs argue that the Agency's

analysis of alternatives was inadequate.  And finally, they contend that the EA did not adequately

address site-specific impacts.

### i.      Three Adverse Impacts

Plaintiffs argue that Defendants' analysis was cursory and failed to consider a number of

impacts, including: 1) the increased use of herbicides; 2) the risk of "super weeds"; and 3) the

risk of transgenic contamination.  <u>See</u> Pls.' Mot. at 22-31.  Defendants respond that they took a

"hard look" at each of these three impacts and that Plaintiffs merely disagree with the agency's

ultimate conclusions.  <u>See</u> Defs.' Mot. at 9-10.  Because the Court's analysis for each of these

impacts is similar, it will first set forth both sides' arguments on all three points and then provide

its reasoning.

Plaintiffs first claim that the EA failed to evaluate the significant adverse impacts on threatened and endangered species from the increased use of herbicides, which results from a rise in transgenic crops.  See Pls.' Mot. at 22-23.  In particular, they allege that Defendants' conclusion that there would be no significant environmental impact from increased pesticide use ignored substantial record evidence of:

- Water contamination, see FWS005430-31;

- Negative impacts on aquatic communities, see FWS004294, FWS005380, FWS005431, FWS004292; and

- Toxic effects of pesticides on amphibians, see FWS004294, FWS000973.

See id. at 24-26.

Defendants counter that the "EA considered herbicide use . . . but concluded that the risks and impacts were low."  Defs.' Mot. at 11 (citing FWS005455).  They note that the herbicide used with these GE crops is "'relatively environmentally benign' when compared to other herbicides, studies demonstrate that 'it does not leach appreciably, has low potential for runoff,' is nontoxic to honeybees, 'practically nontoxic to fish,' and 'has no significant potential to accumulate in animal tissue.'"  Id. (citing Duke, S.O., and S.B. Powles, 2008, found at FWS005455).  Defendants also contend that the agency decision challenged here "does not necessarily result in increased herbicide use."  Defs.' Reply at 5.  This is so, they argue, because the application of herbicides on refuges is only authorized pursuant to a Pesticide Use Proposal, a process that "utilizes its own refuge-specific environmental review, including evaluating the impact on endangered species."  Id. [1]  Additionally, because pesticides must be "applied following label instructions," which restricts use "near water, sensitive habitats, and threatened

---

[1] Plaintiffs' Complaint does not challenge Defendants' Pesticide Use Proposals.  As Defendants note, to the extent that Plaintiffs seek to challenge agency action regarding pesticide use, such challenge should be directed at the specific agency action (the PUP process).  See Defs.' Mot. at 17-18.

and endangered species," the agency concluded that "following label instructions when using herbicides will reduce the risks to wildlife and therefore, that the impacts are not significant." Id. at 6 (citing FWS005455-56).  Finally, Defendants point to scientific evidence on the record illustrating that the use of herbicides would not have adverse effects on amphibians.  See id. at 7 (citing FWS005366 (citing Langeland 2006) and FWS004159-60).

Next, Plaintiffs challenge the EA's failure to adequately assess the "super weed" impact. See Pls.' Mot. at 26-29.  As with the herbicide risks discussed above, Plaintiffs believe that the EA recognized this impact, "but failed to accord proper significance to it in the EA."  Id. at 26. The record identifies the possibility of glyphosate resistance in a number of places, including

- A 2008 study regarding the development of glyphosate-resistant weeds (citing Duke and Powles 2008), see FWS005434;

- An acknowledgement of weed resistance as a foreseeable problem by a refuge manager, see FWS000610;

- References to academic journal articles warning of glyphosate resistance, see FWS003996 and FWS003800;

- Observed resistance of horseweed in the region, see FWS005367-68 and FWS005434; and

- Acknowledgement that the widespread use of GE corn and soybeans on a regular basis "actually encourages herbicide resistance," see FWS005434 (citing Duke and Powles 2008).

See Pls.' Mot. at 27-28.  Plaintiffs further note that Defendants fail to substantiate their claims that Integrated Pest Management and the limit of GE cultivation to a five-year period effectively lower the threat of glyphosate resistance.  See id. at 28-29; see also Pls.' Reply at 8.

Defendants respond that the EA acknowledged the risk of glyphosate-resistant weeds, see, e.g., FWS005434, but determined that "proper stewardship techniques (like crop rotation) and the five year limit on GM corn and soybeans use would reduce the likelihood of developing

glyphosate-resistant weeds on refuges." Defs.' Mot. at 11. These considerations are set forth in

the EA, which points to "Integrated Pest Management" (IPM) techniques currently employed by

the Agency on refuges to "minimize the likelihood of herbicide resistance by regularly changing

the technique used to control weeds: rotating type of herbicide used, rotating crop planted, and

using mechanical methods." FWS005434. The EA directs the public to additional information

on these techniques in FWS guidance available at

http://www.fws.gov/contaminants/Documents/IPMfinal.pdf. See FWS005435 (describing IPM

and recognizing "decrease[d] pest resistance from repetitive pesticide use" as a benefit of

program). Studies cited within the EA further underscore the importance of such techniques,

noting that glyphosate-resistant weeds can be "minimized and managed through the

reintroduction and maintenance of diversity in weed control tools" and employing diverse weed-

management practices, including "better agronomic management to enable crops to suppress

weeds and wise crop husbandry/rotations [to] enable producers to reduce glyphosate reliance."

See FWS003997; see also FWS003804-10 (study identifying weed-control tactics, including

rotation of crops and rotation of herbicides as means to control glyphosate-resistant weeds).

     The third significant impact that Plaintiffs claim has been insufficiently addressed in the

EA is the risk of transgenic contamination. See Pls.' Mot. at 29-31. Plaintiffs assert that

"[t]ransgenic crops grown on refuges can contaminate neighboring fields and seed stocks." Id. at

29. Specifically, they claim that despite a significant number of organic farmers in the Midwest

region – a majority of whom grow corn – the agency's "perfunctory review" relied on two

"outdated USDA documents" to conclude that "'[a] small influx of pollen originating from a

given corn variety does not appreciably change the characteristics of corn in adjacent fields.'"

Id. at 30-31 (citing FWS005435).

Defendants respond that the potential for gene flow from GM corn and soybeans to neighboring crops was addressed in the EA and that the impacts were not significant for two reasons.  See Defs.' Mot. at 12-13.  First, the risk of corn cross-pollination is limited because a "660 foot distance from the pollen source would lead to negligible pollen transmission."  Id. at 11-12 (citing FWS005435).  Second, the risk of soybean cross-pollination is further minimized because they are "'highly self-pollinated with large, heavy seeds that are not easily dispersed.'" Id. at 12 (citing FWS005429).  These determinations, Defendants claim, are well supported by prior analysis conducted by the USDA's Animal and Plant Health Inspection Service (APHIS), the agency charged with evaluating glyphosate-tolerant corn and soybeans.  See id.  Plaintiffs retort that the APHIS analysis is outdated and ignores subsequent events that demonstrate the risk of gene flow to non-transgenic crops, see Pls.' Reply at 12, and that Defendants fail to explain how the 660-foot buffer would be implemented.  See id. at 13.  Defendants claim that, contrary to Plaintiffs' assertions, the 660-foot buffer sufficiently reduces the risk of gene flow and is required pursuant to USDA regulations.  See Defs.' Reply at 9.

For each of the three potential impacts identified by Plaintiffs, the Court finds that the EA sufficiently addresses the environmental effects.  While Plaintiffs challenge Defendants' treatment of these impacts as cursory, see Pls.' Mot. at 14, the reasonableness of the agency's assessment should be looked at with respect to the entirety of the analysis.  For example, in Humane Society of the U.S. v. Hodel, 840 F.2d 45 (D.C. Cir. 1988), this Circuit reasoned:

> Although one might wish the Wildlife Service had addressed with greater specificity the five factors urged above by plaintiffs, in the context of the overall assessment filed by the Service the cursory treatment these factors receive is not fatal to the Service's finding. . . .  As in National Audubon Society v. Hester, 801 F.2d 405 (D.C. Cir.1986), a case also involving the adequacy of an EA, "[t]he Service's documentation may have been succinct, but nonetheless

> adequately discloses the concerns underlying the agency's decision
> and demonstrates that the decision rests on a rational basis."

Id. at 62 (internal citations omitted).

Here, conversely, the treatment was far from cursory.  As set forth in the preceding paragraphs, FWS looked at each of Plaintiffs' concerns.  FWS considered the impacts identified by interested parties through the notice-and-comment period – including the three specific risks identified by Plaintiffs – and the ultimate determination reached by the Agency appears to "rest on a rational basis," such that the EA is adequate under NEPA.  See also Delaware Audubon Soc'y v. Salazar, 829 F. Supp. 2d 273, 285 (D. Del. 2011) (NEPA's requirements met where "[t]he final EA explicitly confronts public concerns, catalogues scientific research outlining risks and benefits of the Project, and acknowledges certain environmental impacts but finds they are not significant").  FWS's conclusions may not be what Plaintiffs wish, but it cannot be gainsaid that they took a hard look at the issues.

ii.     Alternatives

Next, Plaintiffs argue that Defendants failed to consider reasonable alternatives in the EA.  See Pls.' Mot. at 31-35.  Defendants dispute this, maintaining that their analysis of alternatives was thorough, as they considered a number of scenarios prior to their ultimate selection.  See Defs.' Mot. at 9-10.

An agency's choice of alternatives should be "evaluated in light of [its reasonably identified and defined] objectives; an alternative is properly excluded from consideration in an environmental impact statement only if it would be reasonable for the agency to conclude that the alternative does not 'bring about the ends of the federal action.'"  City of Alexandria, Va. v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) (internal citation omitted); see also Flaherty, 850 F. Supp. 2d at 71-72 (internal citations omitted).  The range of alternatives an agency must consider

and discuss under NEPA "is a matter within [the] agency's discretion."  <u>Friends of</u>

<u>Omphompanoosuc v. Fed. Energy Regulatory Comm'n</u>, 968 F.2d 1549, 1558 (2d Cir. 1992).

      Agencies are required to deal with circumstances "as they exist and are likely to exist,"

but are not required to consider alternatives that are "remote and speculative."  <u>Natural</u>

<u>Resources Def. Council, Inc. v. Hodel</u>, 865 F.2d 288, 295 (D.C. Cir. 1988) (internal citations

omitted).  An agency's consideration of alternatives "must be more than a *pro forma*[ ] ritual.

Considering environmental costs means seriously considering alternative actions to avoid them."

<u>Southern Utah Wilderness Alliance v. Norton</u>, 237 F. Supp. 2d 48, 52 (D.D.C. 2002); <u>see also</u>

<u>Biodiversity Conservation Alliance v. U.S. Bureau of Land Mgmt.</u>, 404 F. Supp. 2d 212, 218-19

(D.D.C. 2005) (agency's consideration of alternatives "entirely reasonable" where "only a

limited number of feasible ways to acquire subsurface geologic data for oil and natural gas

development" existed, and agency "expressly considered and rejected three alternatives that this

Court believes is representative of the spectrum of available methods").

      Plaintiffs claim that of the four alternatives presented in the Draft EA, FWS only

seriously considered two – "maintaining the status quo (continued cultivation of transgenic,

herbicide-resistant corn and soybeans on refuge lands) and farming on refuge lands without

transgenic crops" – and unaccountably "rejected [] two reasonable alternatives out of hand,

without analyzing them – 'no farming' and 'unmanaged succession.'"  Pls.' Mot. at 32-33 (citing

FWS005409).  These alternatives, they claim, were rejected without the agency's "provid[ing]

[any] models projecting the cost or rate of restoration; nor [] evaluating the costs associated with

habitat restoration."  <u>Id.</u>  Additionally, they argue that the Agency "entirely failed to consider" "a

myriad of other reasonable alternatives," including growing alternate cover crops, employing

organic methods, or addressing potential planting restrictions that could reduce environmental

harms.  Id. at 34.  Plaintiffs further challenge the alternatives analysis as violating the agency's

own internal policies, which forbid the use of transgenic crops unless "essential" to refuge

purposes.  See id. at 35.

Defendants counter that the EA considered a proper range of reasonable alternatives, see

Defs.' Mot. at 9, pointing to the five that were considered, as well as "five potential wildlife

issues, four potential habitat issues, and four socio-economic issues" for each alternative.  See id.

(citing FWS005430-62).  As to the "no farming" and "unmanaged succession" alternatives that

Plaintiffs claim were rejected "out of hand," Defendants argue that an agency need only "briefly

discuss the reasons" why rejected possibilities were not reasonable alternatives.  See Defs.' Mot.

at 9 (citing Tongass Conservation Soc'y v. Cheney, 924 F.2d 1137, 1140-41 (D.C. Cir. 1991)

and 40 C.F.R. § 1502.14(a)).  The two options were not reasonable, they claim, because the

agency lacks the resources to accomplish habitat restoration in the region without farming, and

"unmanaged succession" does not fulfill the purpose of refuges because "undesirable, invasive,

non-native plants" follow.  See id. at 10 (citing FWS005409 and FWS005410).  Additionally,

they claim that under NEPA, an agency is not required to evaluate "myriad" alternatives that do

not respond to the agency's objectives.  See id.

The Court agrees with Defendants that the EA adequately evaluated alternatives.  The EA

here studied, developed, and described appropriate alternatives to the recommended course of

action.  See Humane Society of U.S. v. Department of Commerce,  432 F. Supp. 2d 4, 23

(D.D.C. 2006).  The agency reviewed alternatives that were "reasonable" in light of the overall

objectives of the program ("administer[ing] a farming program that contributes to achieving the

establishing purposes for lands of the [System] or the mission of the [System]").  FWS005394;

FWS005402.  Four alternatives were originally considered in the Draft EA.  <u>See</u> FWS00757-792.

These alternatives included:

- Alternative A:  Continue Farming for Multiple Objectives, GMGT Corn and Soybeans Allowed (No Action) (Preferred Alternative);

- Alternative B:  Farming for Habitat Restoration Objectives Only, GMGT Corn and Soybeans Allowed;

- Alternative C:  Farming for Multiple Objectives, No GMGT Corn and Soybeans;

- Alternative D:  Limited Row Crop Farming, No GMGT Corn and Soybeans.

<u>Id.</u>

In developing these alternatives, the agency evaluated a number of considerations, including "[b]enefits and impacts to wildlife" and "[c]urrent goals and objectives identified in completed 15-year comprehensive conservation plans."  <u>See</u> FWS00757.  The EA briefly addressed the no-farming and unmanaged-succession options in the "alternatives considered but not developed."  <u>Id.</u>  Both alternatives were rejected for failing to "fulfill the establishing purposes of refuges and wetland management."  <u>Id.</u>  Because both alternatives are inconsistent with the overall objectives, the Court finds that they would not be "reasonable" and thus did not require further examination.  The Court finds, furthermore, that the five alternatives discussed in the Final EA, <u>see</u> FWS005409-5462, are "representative of the spectrum of available methods." <u>See</u> <u>Biodiversity Conservation</u>, 404 F. Supp. 2d at 219; <u>see also</u> <u>Delaware Audubon Soc'y</u>, 829 F. Supp. 2d at 282-83 (EA's discussion of alternatives reasonable where it contained detailed discussion of three alternatives, reflected agency consideration of four other alternatives not discussed in detail, and "'[p]laintiffs have not identified a single alternative that the agency should have considered but did not.'") (internal citations omitted).

The selected alternative here was developed in response to the comments received by the Agency to minimize the possibility of any environmental harm, weighing its environmental costs with its ability to advance the Agency's objectives.  In fact, the Agency's legitimate weighing of alternatives is evinced by its non-selection of Alternative A, which was labeled the "Preferred Alternative" in the Draft EA.  While the Agency did not ultimately select the alternative supported by Plaintiffs, the Court cannot find that it failed to adequately consider reasonable alternatives.  See, e.g., Delaware Audubon Soc'y, 829 F. Supp. 2d at 287 (finding depth of analysis in EA and thorough process employed by agency supported final EA and FONSI).

### iii.     Refuge-Specific Impacts

Plaintiffs also challenge the EA for failing to address the site-specific impacts of growing transgenic crops on refuges.  See Pls.' Mot. at 14-19.  They argue that a site-specific analysis is necessary where the action will affect "thirty-one separate and distinct national wildlife and wetland management districts."  Id. at 14.  Defendants respond that the agency had no obligation to evaluate site-specific impacts.  See Defs.' Mot. at 13-14.  In any event, they argue that there is "a more than adequate system in place for site-specific analysis of environmental impacts" through separate agency actions, including Comprehensive Conservation Plans (CCPs).  See id. at 13; see also Defs.' Reply at 10.

When evaluating the adequacy of an EIS or an EA, courts have long recognized a distinction between programmatic and site-specific environmental analyses.  See, e.g., Nat'l Wildlife Fed. v. Appalachian Reg. Comm'n, 677 F.2d 883, 888 (D.C. Cir. 1981) ("Whereas the programmatic EIS looks ahead and assimilates 'broad issues' relevant to one program design, the site-specific EIS addresses more particularized considerations arising once the overall program reaches the 'second tier,' or implementation stage of its development."); see also Friends of

Yosemite Valley v. Norton, 348 F.3d 789, 800-01 (9th Cir. 2003) (recognizing that "NEPA requires a full evaluation of site-specific impacts only when a 'critical decision' has been made to act on site development- i.e., when 'the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to a project at a particular site'") (quoting California v. Block, 690 F.2d 753, 761 (9th Cir. 1982) (emphasis deleted)).

The agency action challenged here is a programmatic analysis.  See FWS000292 (describing EA as a "programmatic Environmental Assessment"); FWS000299 (same). Plaintiffs argue that site-specific environmental impacts must nonetheless be discussed in any programmatic EA where such impacts are "reasonably foreseeable."  Pls.' Mot. at 14 (citing Kern v. U.S. Bureau of Land Mgmt., 284 F.3d 1062, 1072 (9th Cir. 2002), and Pacific Rivers Council v. U.S. Forest Serv., 668 F.3d 609, 623 (9th Cir. 2010)).  Such an approach, however, has not been uniformly adopted.  For instance, in Wyoming v. U.S. Dept. of Agriculture, 661 F.3d 1209 (10th Cir. 2011), the Tenth Circuit rejected this requirement, affirming the district court's conclusion that it was not necessary to conduct a site-specific analysis: "Because the [challenged rule] is a 'broad' nationwide rule, the Forest Service was permitted under 40 C.F.R. § 1502.4(c)(2) to evaluate the common environmental impacts and effects of the rule 'generically.'"  Id. at 1256.  It further observed that its "role in reviewing the Forest Service's EIS 'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions,'" id. at 1256-57 (internal citations omitted), ultimately holding that the agency had "adequately done so in this instance, despite the fact that it did not include a detailed site-specific analysis of the environmental consequences at each and every specific [site] affected by the rule."  Id. at 1257; see also Sierra Club v. Kimbell, 623 F.3d 549, 560 (8th Cir. 2010) (EIS did not need to address site-specific impacts at programmatic planning

stage as long as it provided sufficient detail to foster informed decisionmaking); Fund for Animals v. Kempthorne, 538 F.3d 124, 138 (2d Cir. 2008) (programmatic EIS sufficient in absence of any certain site-specific action).

Furthermore, because determining the appropriate level of environmental analysis "is fairly debatable," Pacific Rivers, 689 F.3d at 1030, courts have recognized an "obligation [] to defer to the expertise of the agency." Id. Here, not only has the agency provided a programmatic assessment in its EA, but there is a site-specific component as well. Specifically, the EA states that "Comprehensive Conservation Plans (CCPs) have been completed or [are] currently in progress for all but two refuges or management districts that have farming programs," with the remaining two "to occur next year." FWS00549. The Court will not substitute Plaintiffs' view as to the timing of site-specific analyses for that of the expert agency. While Plaintiffs' brief simultaneously challenges the sufficiency of the CCPs, see Pls.' Reply at 18-20, the challenged agency action before the Court is only the adequacy of the regional EA. See Compl., ¶¶ 58-63. The Court thus need not address the specific challenges to the adequacy of the particular site-specific reports here. Last, it is worth noting that to extend Plaintiffs' reading of when site-specific analyses must be included in an EA would transform every programmatic analysis into a site-specific analysis, which would effectively make the programmatic approach "per se invalid under NEPA," a reading that has been expressly rejected. See Friends of Yosemite, 348 F.3d at 800.

Because the Court finds that refuge-specific analyses were not necessary within the challenged EA, it was not arbitrary or capricious for the Agency to analyze impacts on a region-wide basis.

b.      Mitigation

In addition to arguing that Defendants failed to take a "hard look," Plaintiffs also contend

that the Agency's "unsubstantiated remarks and reliance on voluntary measures to reduce a

significant environmental impact do not comply with NEPA." See Pls.' Mot. at 28.  Even if an

agency determines that there would be an environmental impact of significance, an EIS will not

be necessary where the agency has shown that "'safeguards in the project sufficiently reduce the

impact to a minimum.'"  Michigan Gambling Opposition v. Kempthorne, 525 F.3d 23, 29 (D.C.

Cir. 2008) (citing TOMAC v. Norton, 433 F.3d at 861).  Plaintiffs argue that this showing here

was insufficient, thus requiring  the agency to prepare an EIS.  See Pls.' Reply at 9-10.

One mitigation measure challenged by Plaintiffs is Defendants' assertion that increased

herbicide use will not adversely affect wildlife because refuges must follow labeling instructions

and comply with the Pesticide Use Proposals.  See Pls.' Reply at 10 (pointing to Defs.' Mot. at

11; FWS005455-56).  The EA states that, for each alternative evaluated,

> [p]rotective measures will be followed to ensure the proper
> use of herbicides on Service lands.  Service policy requires
> that land managers complete a Pesticide Use Proposal, or
> PUP, before applying herbicide on Service lands.  . . .
> Requiring PUPs helps ensure that product label instructions
> are followed, that pesticides are used effectively and safely,
> that the lowest risk products are selected, and that buffers
> are maintained.

FWS005413; see also FWS005431-32 (describing agency's policies towards herbicide use and

how these policies result in minimizing impact on wildlife).  Plaintiffs may think more should be

done, but they have not shown that the Agency's reliance on existing procedures to minimize

risks associated with herbicides was arbitrary or capricious.  See FWS005460-61 (Table 3:

Comparison of Impacts by Issue).

Similarly, Plaintiffs challenge Defendants' determination that the risk of weed resistance and transgenic contamination will be minimized.  See Pls.' Mot. at 12-13.  Defendants, however, have substantive mitigation measures in place – e.g., a five-year limit on transgenic crop use on particular plots, crop rotation, the use of Integrated Pest Management (IPM) techniques, and 660-foot buffers – and Plaintiffs have not shown why it was arbitrary and capricious for Defendants to determine that such measures sufficiently reduced the environmental impacts.  See FWS005434, FWS005441, FWS005459, FWS005436, FWS005460.  The Court thus finds that it was not arbitrary or capricious for Defendants to rely on these mitigation measures in ultimately determining that the risks identified by Plaintiffs were not significant enough to require an EIS.  See, e.g., Michigan Gambling Opposition (MichGO) v. Norton, 477 F. Supp. 2d 1, 11 (D.D.C. 2007) (FONSI properly issued where mitigation measures reduced environmental impact of proposed action).

c.      Overall Adequacy of the EA

The Court finds, therefore, that Plaintiffs' challenges – either singly or in concert – do not establish that the EA is inadequate under the test set forth in TOMAC, 433 F.3d at 861.  Under the second and third factors of the test, which Plaintiffs challenge together, the Court holds that the Service took a "hard look" at the environmental impacts in preparing the EA and made a convincing case for its FONSI.  See id.  Under the final factor, furthermore, the Court is satisfied that the Agency acted in accordance with the law in identifying existing policies that would minimize the impacts of the project, obviating the need for an EIS.  The Court is satisfied that "no arguably significant consequences have been ignored."  See id. at 860-61.  As a result, the Court finds that Defendants adequately considered the adverse environmental effects in the EA before determining that an EIS was not necessary, making the decision to forgo an EIS not

arbitrary or capricious.  See Spiller v. White, 352 F.3d 235, 245 (5th Cir. 2003) (where agencies

had completed comprehensive EA pursuant to process set forth by NEPA, federal court could not

call agency's conclusion arbitrary or capricious, regardless of whether court agreed or disagreed

with its conclusion).  In addition, the instant case is not one in which it appears that there was an

arbitrary design engineered to reach a particular, predetermined conclusion as to the choice of

alternatives.  See Delaware Audubon Soc'y, 829 F. Supp. 2d at 287-88 (analysis in EA and

process followed by agency did not suggest that agency was "pushing forward with its

predetermined plan without first completing an objective analysis").  On the contrary, the EA

and FONSI here were the product of extensive analysis and significant opportunities for public

participation, and there is nothing to suggest to this Court that the FONSI determination was

prejudged.

      C.  Count II:  NWRSAA and Improvement Act

      Plaintiffs also raise a distinct set of challenges relating to Defendants' obligations under

the National Wildlife Refuge System Administration Act (NWRSAA) and the National Wildlife

Refuge Improvement Act (Improvement Act).  Enacted in 1966, NWRSAA sets forth the

guiding principles and policies for the administration and management of the Refuge System.

The mission of the Refuge System is to "administer a national network of lands and waters for

the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant

resources and their habitats within the United States for the benefit of present and future

generations of Americans."  16 U.S.C. § 668dd(a)(2); see also FWS005400.  The Improvement

Act, similarly, directs the FWS to, among other things, "ensure that the biological integrity,

diversity, and environmental health of the System are maintained." 16 U.S.C. § 668dd(a)(4)(B).

The FWS, "under such regulations as [the Secretary] may prescribe," is authorized "to permit the

use of any area within the System for any purpose . . . whenever [the Secretary] determines that

such uses are compatible with the major purposes for which such areas were established." Id. §

668dd(d)(1)(A).  The NWRSAA defines the phrase "compatible use" as "a wildlife-dependent

recreational use or any other use of a refuge that, in the sound professional judgment of the

Director [of the FWS], will not materially interfere with or detract from the fulfillment of the

mission of the System or the purposes of the refuge." Id. § 668ee(1).  NWRSAA regulations

require that such compatibility determinations: (1) be in writing; (2) identify the proposed or

existing use that the compatibility determination applies to; and (3) state whether the proposed

use is in fact a compatible use based on "sound professional judgment."  See 50 C.F.R. § 25.12.

Plaintiffs argue that Defendants violated the NWRSAA and its implementing regulations

with regard to the Compatibility Determinations (CDs) addressing transgenic crops.  See Pls.'

Mot. at 36-37.  Plaintiffs' central argument is that it was arbitrary and capricious for FWS to rely

on general-farming CDs, rather than transgenic-farming CDs.  See id. at 39.  Defendants contend

that the NWRSAA does not require crop-specific CDs and that "farming" is a compatible use

under the Act.  See Defs.' Mot. at 15-16. [2]

The "compatible use" regulations set forth three categories of "refuge use": "recreational

use," "refuge management economic activity," and "other use of a national wildlife refuge by the

public or other non-National Wildlife Refuge System entity."  50 C.F.R. § 25.12.  "Refuge

management economic activity" is further defined as "refuge management activity on a national

wildlife refuge which results in generation of a commodity which is or can be sold for income or

revenue or traded for goods or services.  Examples include: Farming, grazing, haying, timber

---

[2] Plaintiffs also argue that FWS failed to complete CDs for each refuge where farming takes place, see id. at 37, and that other efforts undertaken by the agency (e.g., GMC Eligibility Questionnaires) do not satisfy NWRSAA requirements.  See id. at 43.  The Court, however, need not address either argument.  Plaintiffs' Reply appears to abandon the first challenge, and because the general-farming CDs fulfill the Agency's requirements, the Court need not determine whether any other actions could have done so.

harvesting, and trapping." <u>Id.</u>  As Defendants note, these uses are "defined by the broad economic activity itself," rather than by the particular commodity.  <u>See</u> Defs.' Mot. at 16. Plaintiffs cite no authority for their position that the regulations require CDs at the crop level. <u>See</u> Pls.' Mot. at 39-43; Pls.' Reply at 28-30.

 An agency's interpretation of its own regulation is entitled to "'substantial deference.'" <u>St. Luke's Hosp. v. Sebelius</u>, 611 F.3d 900, 904 (D.C. Cir. 2010) (quoting <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994)).  Under this standard, the agency's construction controls unless it is "plainly erroneous or inconsistent with the regulation."  <u>Id.</u> (quoting <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512).  In other words, a court may find an agency interpretation unlawful if "an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.'"  <u>Thomas Jefferson Univ.</u>, 512 U.S. at 512 (quoting <u>Gardebring v. Jenkins</u>, 485 U.S. 415, 430 (1988)). Here, the Court finds that the Service's interpretation of the "compatible use" regulation to refer to farming generally is not plainly erroneous.  The Agency, consequently, discharged its duties under the specific regulation by preparing written compatibility determinations at the level of "farming."  <u>Cf.</u> <u>Delaware Audubon Soc'y, Inc. v. Sec'y of the U.S. Dept. of the Interior</u>, 612 F. Supp. 2d 442, 450 (2009) (finding violation of NWRSAA where defendants failed to make written compatibility determination prior to permitting cooperative farming on refuge lands).

 Additionally, as Defendants correctly note, Plaintiffs cannot challenge the CDs under a theory that they fail to comply with the Agency's own internal guidance.  <u>See</u> Defs.' Mot. at 18; Defs.' Reply at 13-14.  This Circuit has recognized that while "agency 'rules' that establish binding norms or agency actions that occasion legal consequences [] are subject to review," "'general statements of [agency] policy'" are unreviewable.  <u>Ctr. for Auto Safety v. Nat'l</u>

Highway Traffic Safety Admin., 452 F.3d 798, 807 (D.C. Cir. 2006).  While "it is not always easy" to categorize a specific action under this framework, id., the Court finds that the internal guidance documents cited by Plaintiffs here are the latter and do not create enforceable rights. See also Wilderness Soc. v. Norton, 434 F.3d 584, 596 (D.C. Cir. 2006).

## IV.   Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiffs'.  A separate Order consistent with the Opinion will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  October 15, 2012